Good morning, everyone, and welcome. Before we begin with our case for oral argument this morning, I'd like to call on Circuit Executive Sarah Shrupp, who has a motion regarding some of our staff attorneys and law clerks. Sarah Shrupp May please report, Chief Judge Sykes. I move the admission of the following attorneys. Please step forward as your name is called. John Dixon of the Bar of the State of Illinois, graduate of the University of St. Thomas, and a clerk for Judge Pryor. Elliana Fleisher of the Bar of the State of Illinois, a graduate of the University of Chicago, and a clerk for the Office of the Staff Attorney. John Gorman of the Bar of the State of Illinois, a graduate of Chicago, Kent, and a clerk for the Office of the Staff Attorney. Anne Gottschalk of the Bar of the State of Illinois, a graduate of Northwestern, and a clerk for the Office of the Staff Attorney. Christopher Hamilton of the Bar of the State of Illinois, a graduate of Boston University, and a clerk for the Office of the Staff Attorney. Brittany Leisman of the Bar of the State of Illinois, a graduate of Northwestern, and a clerk for Judge Kollar. Zion Miller of the Bar of the State of Illinois, a graduate of Indiana Mauer School of Law, and a clerk for the Staff Attorney. Jacqueline O'Brien of the Bar of the State of Illinois, a graduate of Northwestern, and a clerk for Judge Scudder. Ryan Schlossman of the Bar of the State of Illinois, a graduate of the University of Chicago, and a clerk for Judge Kirsch. Emma Stapleton of the Bar of the State of Illinois, a graduate of the University of Chicago, and a clerk for Judge Easterbrook. Rachel Zemke of the Bar of the State of Illinois, a graduate of the University of Chicago, and a clerk for Judge Kollar. I'm satisfied that each possesses the necessary qualifications. Thank you very much, Ms. Schrupp, for your motion. Hearing no objection from the bench, the motion is granted. And if the newly admitted attorneys to our bar would please turn and face the clerk, he will swear you in. First, thank you for your motion. Please raise your right hand if you're fine by doing it. Do you solemnly swear that you as an attorney and as a counselor of the United States Court of Appeals of the Seventh Circuit will conduct yourself lawfully and according to law and that you will support the past and future of the United States? So, welcome to our bar. Thank you. Welcome to our bar. All right, with that, I will call our case for argument this morning, St. Anthony's Hospital versus Elizabeth Whitehorn in her capacity as Director of the Illinois Department of Health Care and Family Services. Mr. Feldman. Good morning, Chief Judge Sykes, and may it please the full court and congratulations to the newly sworn in members of the bar. This case is about two federal rights critical to a safety net hospital like St. Anthony Hospital. One is the statutory right to prompt payment, which will be the focus of my remarks today. The second is the due process right to notice of how payments get calculated by the managed care organizations. As I said, I'm going to focus on the first right and the section U2F issue that we have. And that is the only issue on which the state sought en banc review or sought review in the Supreme Court when it filed a cert petition. And so now following the GVR order, of course, the standard under Tlesky is going to be the main focus of discussion today. I'm happy though, if the court has questions about the other issue, I'm happy to address them if the court wants to address it. The court should be aware that after the initial panel opinion in this case on remand to the district court, we did file an amended complaint. We did include that due process claim in the amended complaint, it was answered. So at least the pleadings in the district court reflect that. And so I'm raising it because I just don't want that issue to get lost in the cracks as the court presumably will focus on the issue on which en banc review is granted and that's the Tlesky issue. Before getting into the weeds on section U2F and the Tlesky issue, I just wanna provide a little context and history regarding Medicaid payments and how critical prompt and transparent payments are to the, well, they're important to any provider, but they're especially important to a safety net hospital like St. Anthony that serves its population is largely Medicaid patients. Court probably knows that Medicaid rates are low. The reimbursement rates are significantly lower than those private insurers negotiate with providers. And hospitals like St. Anthony don't have the luxury of a patient mix that includes private insurance paying patients. So getting payment quickly, albeit at lower rates is critical to keeping the doors open. You'll get in enacting the prompt payment requirement, Congress, while recognizing that the Medicaid rates are going to be low, there's at least a promise to providers that you'll get paid those rates on time. Now, St. Anthony filed this case in April, 2020. We were a month into the pandemic and that occurred two years after Illinois massively expanded its use of MCOs to administer the Medicaid program. And the hospital at the beginning of the pandemic was facing an existential crisis. Not only were the MCOs not paying on time, but because of the transparency problem with their remittances, St. Anthony could not figure out whether they were getting paid the right amounts. What it did know when it compared 2018 to 2020 is that it's cash on hand, dropped from 72 days of operations to two days of operations and its revenues, even though it was basically doing the same thing it had always been doing, had dropped significantly, about $20 million. And this is all set forth in the complaint. So with that context, let me turn to what I think is the main show today, whether there's a right of action to sue under section 1983, under section U2F and the incorporation of section A, 37A in U2F. And there's two questions, I think. Did Tulesky change anything? And if so, how? And second, under the standard, can St. Anthony sue the state for violations of section U2F? So turning first to whether Tulesky changed the standard. The state argues that the panel majority was not faithful to Tulesky. Nothing could be further from the truth. The majority's analysis was quoted extensively from Tulesky, applied it faithfully, as did the Fourth Circuit in the Planned Parenthood versus Kerr opinion that we circulated in a 28-J letter last week. Mr. Feldman, let's focus then on Tulesky. Tulesky has us focus on whether a clear and unambiguous right has been conferred on a discrete class of beneficiaries. Your position, I take, is that the double shall in the statute, U2F, operates to create a right. Isn't the shall actually imposing an obligation on the state and on the managed care organizations? I think it's all of the above. It imposes, the shall is part of creating the right. And the shall is imposing on the state the obligation to put that right into a contract with the MCOs that the MCOs are then required to put in their contracts with the providers. But the right, the shall, the right is to be paid on time because what section U2F also does, embedded within the language and the shall, is it incorporates the prompt payment requirement from section 37A. So it's really two sections together that must be read together. And section 37A is absolutely clear. It's a very clear metric. Pay, clean claims, within 30 days, 90% of clean claims must be paid, and 99% within 90 days. That's a very unequivocal command, and that is at the heart of satisfying the Teleski-Gonzaga standard of a clear and unambiguous right. So let's then focus on Gonzaga because Gonzaga tells us, on my page 288, you can't have a private right of action when the statute takes an aggregate focus. And here, isn't that aggregate focus on all the contracts having a payment schedule instead of being concerned with an individual instance of non-payment? No, I disagree. Doesn't the hospital fall within the zone of interest, similar to Gonzaga? No, it doesn't. As students did in Gonzaga? It does more than fall within the zone of interest. Each provider under the statute has an individual right to get paid on time. And one reason we know that is that later in section U2F, there's the sentence that says, the provider and the MCO can agree to a different timeframe. If it was an aggregate, there'd be no reason to include that. The inclusion of the provider can either waive or insist on increasing the timeliness if it negotiates it with the MCO shows that each provider has that right and has the option to negotiate a different right. So it is individual. And I'll note that in its en banc submission, the state seems to have abandoned that aggregate argument as well. But isn't there a disconnect between recognizing an individual-centric right, which you're asking this court to do, although the statute doesn't use the word right, and then characterizing that remedy as a exclusively systemic remedy that those two just don't follow, do they? Well, I think there's a couple different things at play here, Judge Brennan. One is the right is the right to get paid on time. And that we've shown in the papers, I think, is consistent and follows the Tlefsky-Gonzaga or blessing, if you wanna apply blessing, whatever standard you use, there's a clear and ambiguous right to get paid on time. I think it's a different question if you wanna ask, well, when can you sue the state for violation of that right? I thought the point, counsel, was that if an MCO is consistently, systemically failing to pay a particular provider, you're claiming a right of action. You don't need to show, as I understand your theory, that other hospitals are being mistreated in similar ways. That's correct. That's correct, Judge. But there's still an aggregation issue in the sense that showing one-way payment on one particular patient's claim is far, far short of anything actionable. That's right. If one MCO missed the bogey, the 90-day bogey for one month, no hospital is gonna run into court and seek relief against the state or go to an arbitration with that MCO. Can I ask you to back up for a second? You talked about the conversion from primarily fee-for-service model in Illinois' Medicaid program to the managed care. Apart from managed care, under the fee-for-service program, in essence, did the panel get the history right on there having been a right enforceable under Section 1983 for both adequate payments under Wilder and for timely payments under the statute? The short answer is yes. And are you aware of any indication from Congress that when it adopted the MCO model and authorized it, that it was trying to take away providers' rights to sue under 1983? No, there's no indication whatsoever. Wilder talks about a good deal of history that Congress and healthcare providers and states have had intense debates about Medicaid remedies for providers and patients in 1983 and administrative bar. This is a major focus of congressional legislation. That's correct. I think what Congress was doing, it was giving states the option, if they wanted to use managed care organizations to process these claims, it had that option to do it, but it still had to comply with the basic requirement of prompt payment and the other requirements that were part of a state plan. Why are contract remedies not sufficient for you? Contract remedies, because, as you mentioned, Judge Hamilton, because of the systemic nature of the problem here. So let's follow up on that. Gonzaga says, and Gonzaga, of course, is about the school, the loans. Non-disclosure provisions speak only in terms of institutional policy and practice, not individual instances of disclosure. So Teleski tells us to follow Gonzaga. Gonzaga is saying, as in Blessing, they have an aggregate focus. They're not concerned with whether the needs of any particular person have been satisfied. Doesn't that take us away from any kind of recovery for an individual entity like Congress? No, I don't think it does, but the FERPA statute was very different in significant ways than Section U2F, the FERPA statute being the federal educational privacy statute that was at issue in Gonzaga, and the language of that statute was more general. It's talking about the policy that the schools would have to follow, and the language was an aggregate focus language. Here, the language is a requirement that each provider be paid on the 30-90 day timeline, and as I mentioned before, there is that provision that each provider in its separate negotiations with an MCO can opt for a different timeline, but it has that right in order to be able to make that decision to opt for a different timeline. So I think the short answer to sum up Judge Brennan is that the statutes are fundamentally different, and the court, Gonzaga, found it more general and aggregate, and the panel majority here, I respectfully submit, correctly found that to be a different analysis. So your position is that the hospital is not a zone of interest, doesn't fall within the zone of interest? It doesn't really fall within the zone of interest. It has a clear and unambiguous right. It satisfies, and that goes back to blessing. The zone of interest concept was first stated in blessing, carried forward in Gonzaga, carried forward in Tlaibsky, and you need more than the zone of interest. That's not sufficient under that line of cases, but here you do have more. You have the clear and unambiguous language creating an individual right. If it's clear and unambiguous, why on page 17 of your supplemental brief did you say that it's plausible, it can be read two different ways? I, clear and unambiguous to me says one way. In your submission, you say plausible either way. I don't recall how we phrased it on page 17 without checking it, but I'm quite confident that we stated in numerous places in our briefs that the right is clear and unambiguous. So I can go back and look if you want me to parse that sentence. Mr. Feldman, if I could ask you a question getting back to contractual remedies. As I read the contract, I went back and looked at the contract that Meridian submitted as part of its motion to compel arbitration. As I read it, at least, it appears that St. Anthony's could bring a, for lack of a better word, pattern and practice claim in arbitration. They could bring a claim that says, you know what, they're violating, systemically violating paragraph 4.3 of the statute. The payment obligation. And that the arbitration doesn't have to necessarily be one claim per arbitration, but you could have one general systemic failure claim in arbitration. Am I reading that correctly? I think you are reading that correctly, but I think your question, Judge Lee, goes to the second part of the Tlesky-Gonzaga blessing, that whole line of case. If you find a clear and unambiguous right, like the question then, you have then a presumption that the right is enforceable and... I wonder though, I don't know whether in a situation like this, those two elements can be so easily separated. Right? I mean, we're looking at, we're trying to figure out for what it's worth. I agree with Judge Hamilton that as far as the direct payment under the fee-for-service model, that provision, I think, can be read to confer a individualized right. And then I was trying to look for the differences between that regime and the managed care regime. One is this arbitration provision. And so it seems to me that that might be relevant to whether or not Congress intended for a right to be conferred upon St. Anthony's in the managed care context. By providing St. Anthony's with this kind of other way of trying to address their concerns even systemically. Well, I think if Congress intended to narrow the rights that providers had under Section 37, it did so silently. I don't think the statute actually provides for any such narrowing. And I can't say that it's entirely separate as you're saying from the principal analysis, but I do think that the question really goes more to whether the presumption is overcome. Clearly, St. Anthony could bring individual arbitrations to enforce its contract right. But the question that the cases pose is whether Congress intended a comprehensive enforcement scheme that is incompatible with bringing a Section 1983 action. And the availability of the arbitration remedy is not incompatible with coming to court to seek a remedy against the state to remedy a systemic violation that wasn't just for one NCO. Although I think we could go against the state even if it was one NCO engaging in very serious problems. But here we had all of the NCOs not meeting the statutory right. And the state wasn't even paying attention to it. They weren't even collecting the data to allow them to assess whether even in the aggregate the NCOs were meeting the correct statutory. Do you think that St. Anthony's has the right to pursue simultaneously a 1983 action against the state as well as an arbitration claim against each NCO on a pattern and practice basis? Well, I think in theory, I guess, and I guess the follow-up to that is if it's yes, then doesn't that lead to the possibility of incompatible outcomes in both of those forums? And so I was gonna say in theory, yes, you can have parallel actions, but I think for ordinary questions of judicial administration, if there were parallel proceedings where St. Anthony were seeking relief directly against the NCOs and seeking relief against the state, and here we're only seeking relief against the state in this lawsuit, but if there were such parallel proceedings, I imagine there would be motion practice in one or both fora in order to coordinate them so that you wouldn't get that risk of inconsistent adjudication. Mr. Feldman, can I ask you a question on the remedy side of the case? Sure. Can you give us a sense, I've read your complaint, but give us a sense of appropriate terms and conditions of the injunctive relief that St. Anthony is seeking? I think at the highest level, let's say we are fortunate enough to get back in the district court and we're at the remedial phase. I think as not uncommonly happens in cases like these, I think the first step is that we would ask the court and the district court would presumably go to the state first and say, what do you propose in order to remedy this problem? Some of that involves monitoring and paying attention to the right metrics about whether the NCOs are in fact meeting the, and discovery would presumably shed some light on that. That would help identify what the source of the problem. Remember section 37A talks about there being adequate claim payment procedures to ensure that the 30, 90 days standard is met. So there would be review of the claim payment procedures to see whether they are fit to the task at hand. So I think there would be, as is often the case in these kinds of remedial situations, there would have to be an iterative process based on discovery to identify what the source of the problem is and allow the state to propose a solution as was the case in the OB versus Norwood case where the court said that first, the state has to at least do something. So propose- Along that iterative path, if the deficiencies continued and remained material and were very adversely affecting St. Anthony's cashflow, do you think a federal district court could ever get to a point of forcing the state to cancel a contract? Very unlikely. And I should point out- What would be the legal barrier to that?  What would be the legal barrier to that? I think it's more of an equitable barrier than a legal barrier. It would be an extraordinary exercise of equitable discretion. I think the majority panel opinion probably was dictum, but if the dictum rang loud and clear, that would be probably an extraordinary and probably unavailable remedy. I should point out that our amended complaint that I mentioned at the beginning that's on file, that particular prayer for relief in light of the initial panel opinion, we dropped that prayer in our amended complaint. Mr. Kellman, you've argued that only systemic violations are actionable so that the courts aren't flooded with individual actions. Where does the support for systemic come from in the statute? It comes back to something I started talking about earlier, where I think we have to separate, and how we think about this, the right from whether there's a claim against the state for violation of that right. So the right is the right to get paid on the 30-90 day timeline that's established in the statute. If the hospital's not paid under that timeline, there is a violation of that right, and that right meets the Gonzaga test. It's clear and unambiguous. So can you bring an action against the state for violation of that right? As I said earlier, if one MCO goes off the rails one month or two months, there would probably not be a right to go against the state for that. But why? Where are you deriving that from? From section 37A, which talks about there being claim payments procedures that ensure that the standard is met. If an MCO has a bad month or two bad months, is the state responsible for that? Probably not. But if- Mr. Feldman, what about three bad months? I think if you're getting to the, I don't know exactly where the line would be- Who does? In what direction do we give to the district courts? So if we say you could go back and proceed on systemic violations, what direction do we give? Is that a question of law, whether or not it's systemic? Is it a question of fact? How is that supposed to be determined when there's nothing in the statute that talks about systemic? I think it is a question of fact, Judge Saini. Here on the pleadings, we're way past where that line would be, given what is alleged in the complaint about how comprehensive it was across, especially county care, but each of the MCOs was not meeting the appropriate standards. So you can find systemic very easily in this case. But where you draw the line, I think it would have, you would have the ordinary Twombly-Iqbal analysis at the pleading stage. I think it's a legal question, not a factual question. The question goes to whether the statute provides a right against the state. And your argument is that only for systemic violations, not for ordinary garden variety daily violations. And that distinction appears nowhere in the statute. Whether the facts support such a systemic claim is a separate question. That's not what the unbound court here is concerned about today. It's the legal question. Well, I think coming back to Gonzaga, okay, and if you look at the standards that set forth in Gonzaga, you first look at what is the right, okay? And here, the right is the right to get paid on time. So, and Gonzaga standard is met. So if the hospital is not getting paid on time, there is a violation of that right. But now we come to, so that's the core legal question. Now you come to the question, all right, now we're gonna plead, someone's gonna come in and plead a claim against the state for violation of that right. As in any ordinary claim, whether it's a constitutional claim or statutory claim against a defendant, you have to identify the right, you have to identify the violation of the right, but you have to identify something that makes the defendant potentially liable, responsible for that violation, okay? So you have the right, and that's clear and ambiguous, but whether a claim is stated against the particular defendant you're suing, you still have to establish the usual kinds of elements you would in any kind of constitutional statutory tort claim for that defendant to be responsible. And I think coming back then to section 37A, that is found in there being a requirement that there be claim payments procedures that ensure that the timely payment standard is met. So that's how I would distinguish the right from whether a claim is stated against the state. On the other side of that, if you were to accept, or I guess respond to the argument that what we see in this provision is maybe potentially not a right for, but a contract provision where the healthcare provider is benefiting from a contract provision. And so how would you respond looking at Kinsaga, when you're looking at this statute, are we stretching it from that being a third-party beneficiary to that of a right? How would you respond? So the hospital is not a third-party beneficiary of the statute. The statute goes directly to the hospital's right. And the hospital does have direct contract rights with the MCOs. I don't know if your question, Judge Pryor, is whether we're relying on a third-party beneficiary theory as between the MCO contract with the state. I'm not sure that's what your question is. That is not our theory. Our theory is we have a direct right of action under the statute. As in any of these spending power cases, including the line of Seventh Circuit cases that we cited in the papers, Congress can't just say to the state or say to an MCO, thou shalt pay on time. It has to do so through its spending power, which means in the case of the state, it has to do so through the provisions that go into a state plan. And because now we're another step removed, we're going to MCO land. Congress has to say, all right, state is part of your plan. And you also have to put this language into your contract with the MCOs. So that's the means by which the right is implemented. But the right is still the same, whether it appears in a plan document or a plan document and the MCO HFS contract. That means is the means to enforce Congress's intent that the providers have a right to get paid on time. Would it be accurate to say that the state officials have a duty that is to see that, not with respect to individual patient claim payments, but with respect to the overall compliance with the payment schedules? Yes, I would say that. That's what they have the powers to be able to do something about. I agree. And then that goes back to Judge Saney's systemic, not in the statute, right? The word systemic is not in the statute. I provided, I believe, the analysis that explains why there's a claim against the state for systemic violation. Mr. Feldman, I apologize if you answered this earlier, but just to be clear, has St. Anthony's pursued anything against the MCOs either by suing them or pursuing arbitration? No, there is in the record Meridian, I believe it was Meridian, filed an arbitration early. And that arbitration was initially, I'm not sure dismiss is the right term, but they had not gone through the procedures in the contract for what you need to do before bringing an arbitration. And they did not clearly state any sort of claim. So that was sort of put on hold pending this litigation. I had reserved 20 minutes. I still have one minute left. I don't know if I have to answer more questions, but if not, I would ask the court to reverse the trial court and I'll reserve my last minute if I can. I'll give you some extra time. Thank you. Mr. Hussak, did I butcher that? I'm sorry. I think Judge Bauer was the only one who knew how to pronounce that. This is time dealing with the Hussak family lawyer conspiracy. Richard Hussak, Assistant Attorney General representing the defendant, may it please the court. The issue in this appeal is whether section U2F of the Medicaid statute under the strict standards announced in Tlaibski unambiguously gives healthcare providers in managed care programs an individual right enforceable under section 1983 to have states ensure that a managed care organization pays the provider on a timely basis. The text and context of section U2F as part of section U2, which added the managed care program or expanded it in Medicaid to allow states to include managed care in their state plans does not satisfy that strict test including the threshold element that the statute unambiguously declare a specific state duty that the plaintiff claims an individual right to enforce. Instead, the statutes plain terms which say that the state must include the timely payment clause in its contract with an MCO that requires the MCO to pay the providers on a timely basis. But isn't that a rights bearing clause? To the extent that there would be a claim that the state hasn't put the timely payment clause in its contract, the statute says shall and there's a decent argument not before the court whether the state has failed to fulfill that duty to put it in its contract. But there's no dispute that that clause is in all of these contracts and the federal government reviews these contracts to make sure they satisfy with that duty to include it in the contract. But that language bespeaks a contract-based enforcement mechanism for the MCO's contractual obligation to pay providers on a timely basis. So it's a paper right only as against the contract. No, the providers have their contractual right against the MCOs and the states have an additional contractual right against the MCOs to implement Congress's policy to have the MCOs pay the providers on a timely basis. The idea that that's a meaningless piece of paper I think is incorrect and I want to delve into this. If the state is not even carrying out its monitoring of timely payments as alleged here, how is it more than a paper right? Well, actually I dispute the factual predicate of that. The motion to dismiss, well be six, the complaint alleges it, so please take that for granted. Well, the complaint refers to the first, one of the first reports that the state issued that shows that it was pursuing an analysis of the timeliness of the MCO payments. Their own complaint exhibit are referred to in their document shows that the state was gathering this information and the report itself shows that the state was determining what the timeliness of the MCO payments were. So, and I think it's problematic to assume that if a statute gives a state discretion, contractual or statutory discretion to pursue an enforcement action, that somehow that can't be acceptable. Congress had a choice here when it established the policy that MCOs must pay providers on a timely basis. As the Jackson Transit case says, it could have adopted a policy of contract-based enforcement, where those disputes over contract rights would normally be adjudicated under state law, typically in state court. That was a legitimate choice that Congress could have made. Or as the plaintiffs allege, it could have made the choice to adopt a system of statutory rights, statutory duties enforceable in federal court. Before this provision was added to the Medicaid Act in 1987, there had been various experiments with managed care programs under Medicaid in which the mechanism that was adopted was for the MCOs to negotiate payment terms with providers and disputes over those were resolved as contract disputes, not in federal court. So Congress had a choice whether to go with statutory rights and remedies enforceable in federal court or contract-based enforcement. And I think if you imagine how Congress would have enacted a statute, adopting one or the other approach to enforcement of the MCOs obligation, then it's clear that the language of the statute here, both U2F and the enforcement provisions of U2E are totally consistent with Congress's choice for a contract-based enforcement mechanism, not a statutory-based enforcement mechanism. And I wanna add another critical observation here, which is that it is very unusual for a statute to create a private right to force the government, state or federal government, to bring an enforcement action against a third party. But that is essentially what the plaintiff is alleging here. And one of the problems with that is that normally enforcement rights as Heckler v. Cheney holds are discretionary and the district court made the same point. And if Congress doesn't put limits on that discretion, then the courts aren't free to do so. There are lots of good policy reasons why that discretion should be recognized. And that's a feature, not a bug. So the state has discretion. Can I ask you though, would you agree that subsection E of U2 does require the state sometimes to impose sanctions on managed care organizations? For violations of their statutory duties and in a manner that does not include the enforcement measure that the plaintiffs want the courts to add to that statute, which is to force MCOs to pay providers on a timely basis. That enforcement provision is exhaustive and it doesn't include the specific measure that the plaintiff demands the court to add to it. It is, by its terms, it gives almost complete discretion to the state over all enforcement. It distinguishes between MCO violations of statutory duties, contractual duties. The single measure that it prescribes for an MCO's violation of its contractual duties is termination, which is expressly discretionary. And the only mandatory measure that it includes for an MCO's violation of its statutory duties, not its contractual duties, is for the benefit of the enrollees. It says that you will appoint interim management to take over to ensure the health of the enrollees and allow the enrollees to leave the plan, go to another plan. So you've got this elaborate, complicated, detailed enforcement provision over a thousand words long and it nowhere includes the specific enforcement measure that the plaintiffs want the court to say that a district court can impose here. The silence with respect to that reinforces the silence in the statute with respect to the claimed statutory right against the state. The plaintiffs are actually fairly flexible about the kind of remedy they're seeking, exactly what the injunction might look like. And that's one of the issues that makes this case so challenging. But I'm looking in particular at E3 and in the case of a Medicaid managed care organization, which has, quote, repeatedly failed to meet the requirements of section 1396 BM of this title, the state shall, regardless of what other sanctions are provided, impose the sanctions described in some paragraphs you were referring to. We've got there repeatedly and you shall take steps, right? But what it says, what you've repeatedly done is violate your statutory rules. U2E draws a distinction between contractual violations and statutory violations. It authorizes the discretionary enforcement measures for certain contractual violations. But this provision, U2E3, is limited to statutory violations. And the remedy that it authorizes is imposing interim management for the MCO and allowing enrollees to change the plan. That's the only provision in that exhaustive enforcement subsection that imposes any mandatory obligations. And it includes remedies that don't connect with the relief that the plaintiffs want a court to add here. There's also a threshold issue of what is the liability requirement. We're not just talking about remedies. The plaintiff is saying that the liability here is for a state's failure to comply with its alleged duty to ensure that MCOs pay them on time. But the duty in the statute doesn't say anything about a state ensuring that the MCOs pay the providers on time. It says that the states have a contractual right pursuant to the mandatory timely payment clause to have MCOs comply with that. And again, the discretion is important. That's inherent in a lot of government functions. And it's not a toothless power. The record here shows that in the one situation where there were serious problems with a Cook County-operated MCO, the state implemented its contract remedies. It would be nice to say that anytime government has discretion, it might misuse that by not going after somebody who's violating it. So perhaps somebody could argue that every time there's a tax evasion claim, the federal government should go after them civilly to pursue it. But Heckler v. Cheney says, and common law of contract says, that if there's an enforcement right, it's discretionary, and you can't just take it away on the theory that somehow it might be unfair if it's not always aggressively applied. Here, the state has applied it. And it believes that the discretion inherent in being able to enforce that in particular circumstances is beneficial, not detrimental. We really shouldn't be getting into policy considerations about whether contract enforcement is deficient or useless and the system of statutory rights is somehow powerfully better. That was Congress's choice to make. Zelensky says that the choice with respect to these issues is Congress's choice to make under separation of powers principles. And courts implement that choice based upon the words that Congress enacted. It cannot change that choice. It can't add words to the statute to do what it thinks might better effectuate Congress's goals. And here, Congress had other goals that were in competition. One was reducing the amount of administrative burden on states. The other was to avoid having all these disputes heard in federal court. So this is not really the debate that should inform the court's decision here. The issue is, does the statute impose unambiguously a duty on states to require MCOs to pay providers on time? It doesn't do so. There's constant reference by my colleague, St. Anthony's counsel saying that it's undisputed that providers have a right to timely payment. But that's a right against whom? And under what legal theory? It's a right against the MCO under a contract theory. Nothing says that they have a right to enforce an alleged statutory duty by a state to force the MCOs to make timely payments. Again, the language that Congress chose is completely consistent with its adopting a contract-based enforcement mechanism, not some system of statutory rights and duties. And it's good to ask yourself, if Congress had wanted to adopt a system of statutory rights and duties, how would it have written that statute? It didn't write a statute like that at all. Instead, it wrote a statute completely consistent with the notion that it was creating a contract-based enforcement mechanism. Providers have contract rights against MCOs, and that's supplemented by the fact that the state has contract rights against the MCOs. Now, there's this idea that under the fee-for-service model, providers had an individual right to enforce the A37A requirement of payments to certain providers. I just wanna say that this court held in the Illinois Council on Long-Term Care versus Bradley case, that that excluded hospitals. There was no statutory right for hospitals to get paid. There was just a regulation saying they could be paid within a year. But that structure, consistent with the history of managed care even before 1997, which is that there was a right by the payee, the provider, against the payor, the state in that system. That's now shifted. The payor is the MCO. That structure is preserved. The right is against the MCO, and the states are essentially an additional supplementary mechanism to try to get the providers paid on time, but it's a discretionary right. And the notion that the state somehow, that the facts of this case can affect what Congress intended in 1997, I think is beside the point. But- Mr. Jose, does Title 42 of the U.S. Code or any of its implementing regulations impose obligations upon a department or agency of the national government, to your knowledge, the federal government to oversee states' adherence to their obligations under the Medicaid statute? I think there are some provisions that require the Center for Medicare and Medicaid Services, CMS, to ensure that states comply with their plan provisions. But the case law says that that's discretionary. You can't enforce that in federal court. That's a cognate provision to what's going on here, which is that here the state not has a duty, but has a right to enforce the timely payment clause in this contract. And what's interesting is the same law that added U2F to the Medicaid Act included a parallel provision with virtually identical language for the Medicare provision that expanded managed care. They called it Medicare Plus Choice at the time. And it says that the federal government shall require its contract with these Medicaid Plus Choice entities, now Medicare Advantage entities, to require them to pay certain providers on a timely basis. And the rest of that statute makes clear that the federal government has absolute discretion over enforcing that contractual right. The notion here is that the rights that the plaintiffs claim are contract rights, and they're contract rights against the MCOs. The other contract right that the statute provides as additional protection is a contract right by the state, but a right is not a duty. You can't say that if the state has a right to enforce this provision against an MCO in its discretion, somehow it has a duty to do so. And then you can fill in all sorts of gaps about, well, what would be the threshold beyond which a breach of an MCO's obligation to comply with the timely payment clause somehow triggers a state obligation that's nowhere included in the statute to start to take action. The problem here is that the statute doesn't include any of the types of detailed provisions that you would expect Congress to have included if it were going to impose a statutory duty on states to force MCOs to make timely payments. It doesn't have- That's the problem that it also doesn't seem to include a comprehensive enforcement scheme of the type that we see, for example, in Gonzaga. So can you address that? It's a shift. Certainly. I mean, if there were an unambiguous duty and explicit rights-creating individual-centric language saying that the states owe that duty to individual providers, and I'd like to return to that because that's not what the statute says, then we would get to step two of Kalevsky. And that would be if there's a presumption of an individual right by providers to require states to perform this alleged duty. Then that could be rebutted if Section 1983 enforcement would be inconsistent with an alternative enforcement scheme. And I think the city of Rancho Palos Verdes is one of the best cases that says if Congress creates a mechanism, it may not have all the whistles and bells of Section 1983, but a Section 1983 remedy would be inconsistent with that. Would it either interfere with it or create all sorts of other benefits that are not provided under that contemplated enforcement scheme? Then we're going to assume that Congress didn't intend Section 1983 to be a supplemental cause of action. And that's, I think, essentially what's happened here. The comprehensive enforcement scheme is the contract-based enforcement scheme that the statute contemplates. Contract rights by providers against MCOs supplemented by state contract rights against MCOs. And the alleged statutory duty and right that the plaintiffs claim to have here would interfere with both of those. As the MCOs Council will argue, it's going to basically disrupt the normal operation of the adjudication of those contract disputes between providers and MCOs. And in addition, it's going to negate the discretion that states have under form book contract law to enforce their rights against an MCO that's delinquent. Because if the federal court at the behest of a private party is determining at the threshold liability issue, whether a state has violated its alleged duty to pursue some enforcement measure against an MCO, whatever it is, then states have lost the contractual discretion that the statute explicitly gives it. There is critically nothing in U2F that says states have an obligation to require MCOs to pay providers on time. It says the opposite. It says states have an obligation to put a contract provision in their contracts with MCOs that gives states the right to have MCOs pay providers on time. And the enforcement theory that the plaintiffs advocate here under section 1983 would essentially negate and nullify that contractual discretion that the statute gives it. And it would also not just add words to U2F, it would add words to U2E by creating a new enforcement measure that Congress didn't include when it wrote this exhaustive list of enforcement measures that the statute actually provides according to what Congress said. Without going into a long repetition of the arguments in our brief, all of the monitoring provisions in the statute to the extent that they actually relate to MCO payments are fully consistent with and support the notion of contract-based enforcement of MCOs contractual duty to pay providers on time. Those are information that's beneficial to the state so that it can then determine whether, when and how to enforce its contractual rights against an MCO. Counsel, can I ask one other thing? Briefing has extended over several years, at least for some of us involved with this case. And I may be misremembering something, but would you agree that the state's contracts with the managed care organizations inherently give those organizations an incentive to deny or delay payments where they can to providers? I don't think that's the case. I think that anybody who has a financial interest in some transaction could theoretically have an incentive to cheat, delay, whatever. But state law here does impose a 9% interest charge on any payment by an MCO that's after 30 days, not just the 90% requirement. And if they delay a payment, they just delay it into the next fiscal quarter. It's hard to imagine that there would be some compelling need, but there's no good abuses in managed care historically. And I think Congress was cognizant of those. And when it enacted this statute, there are all sorts of provisions to prevent MCOs from knocking on doors and making false promises. That history, which was embedded into the managed care provisions of U2F for Medicaid incorporates many of those protections, but what it doesn't do is deviate from the past history under Medicaid managed care programs where there's contract rights between the providers and the MCOs that they negotiated subject to state law contract. But is the core payment essentially per capita payment from the state to the managed care organization? Absolutely, and there's also a medical loss ratio. MCOs can't pay out in benefits less than the medical loss threshold. So there's no way that they can just somehow collect the capitation payments and then close their eyes on what's happening to the providers. And the state is spending more than $20 billion a year for Medicaid benefits. They're voluntarily agreeing to spend tens of billions of dollars of their own taxpayers' money to provide medical services to the most needy in our community. That's a real commitment. And the front line in fulfilling that mission is the providers. They need the providers to do that. As my colleague said, the Medicaid reimbursement amounts are low. And the last thing they want is hospitals and providers to bail from the system because they're not getting paid or not getting paid on time. So the state has a strong incentive to fulfill its statutory mission. I'm less concerned about the state's incentives, which I agree are powerful, and particularly for the health of millions of people in Illinois. I'm more concerned about the advantages, the incentives that are available to the MCOs under those contracts to, for example, deny coverage. I don't think there's a powerful incentive there. I think there's a theoretical incentive. There have been historic abuses in managed care, HMOs, and, but- So if the expenses paid in a particular year are less than the state anticipated in budgeting the per capita, who gets the benefit? Well, the MCO is a risk entity. They assume the risk. They get the risks of both loss and profit. Exactly right. And that's true with many managed care groups. I think that's all I'm trying to ask. There's no doubt that there's a theoretical incentive there, but there are checks and balances. And the history of that incentive existed before U2F was enacted. Congress was aware of it. And so it built in protections. But the question is, does it choose contract-based protections or did it instead intend to adopt statutory duties, statutory rights enforceable in federal court? And I think it's pretty clear if you read the statute, what it says, and it doesn't say, that Congress avoided specifically creating statutory rights and duties that would all flood into federal court anytime a provider complained that an MCO was not paying it what it owed or was not paying on time. Counselor, so taking your distinction between contractual enforcement rights, statutory enforcement rights, to the extent that Congress ordered or required states to monitor contractual compliance of MCOs, okay? Would a party like St. Anthony's be able to sue the state to enforce that obligation that is the state's obligation to monitor? I think that goes back to the issue of whether it's an aggregate policy or whether it's a duty owed by the state to an individual provider. And this goes to the language of U2F itself, which says that states shall include in their contracts with MCOs a provision requiring the MCO to pay providers on a certain schedule. The carve-out or an opt-out for a provider and MCO that choose a different schedule doesn't change anything. That's the same as what happened in Gonzaga where there was an aggregate policy, but parents could consent to their student's information being disclosed. And the court still said, the focus isn't on giving rights to individual students, it's an aggregate policy that sometimes there's exceptions to. That's the same thing here. The language of the statute doesn't say the state has some supposed duty to fulfill this obligation to each provider or every provider. It says that MCO's contract shall require them to pay providers. Now, the plaintiffs have resurrected their theory that somehow the reference to Section A, A37A incorporated into U2F, the timely payment clause, somehow imposes a statutory duty on states to enforce. Could I finish this one comment, if I may? Your Honor, thank you. The district court said that's not what the statute says at all. The panel didn't even adopt that theory, the vacated panel majority opinion. And it doesn't make any sense. The reference to the A37A schedule is simply to adopt the same schedule for an MCO's contractual obligation to a state to determine the terms of that contractual obligation, what the definition of a clean claim is and what the schedule for that payment is under an MCO's contract. The idea that in describing an MCO's contractual obligations to a state, that Congress was actually imposing a statutory duty on a state to make sure that providers get paid on time, it violates the principle that Congress doesn't hide elephants in mouse holes. This was simply a reference to a schedule for the MCO's contractual obligation. It didn't create this amazing and burdensome obligation on states that the plaintiffs allege here. So for those reasons and those in our brief, unless the court has additional questions, we urge the court to find that U2F adopts a method of contract-based enforcement of MCO's obligations to pay providers on time, not a system of federally imposed statutory rights and duties enforceable under section 1983 in federal court. Thank you so much, Your Honor. Can I ask one question? Regarding the due process claim, I just wanna make sure I understand what's going on there. So previously in this litigation, the state said that it was waiving a claim preclusion defense in the event that the due process claim was brought in subsequent suit. I take it that that remains the state's position.  Now, again, our petition for re-hearing under the rules regarding petitions re-hearing didn't ask the court to revisit that issue because it's not one of these major questions of law. It's an application of law to fact that the district court abuses discretion in denying plaintiffs leave to file this supplemental complaint, adding a due process claim that goes beyond managed care, now includes the fee-for-service programs. I think we know all that. So we made that stipulation. We argued that it was supplementary because the district court said they could bring that claim in another case, but we reinforced it, Feldman, Peiris, and Schneider, saying we are not going to assert preclusion unless the court, in its own decision, revisits that issue and needs to address it, but it's not changing in any event. Thank you. Yeah, that stipulation remains good. Thank you very much. Mr. Feldman, I'll give you, oh, I'm sorry. We had a divided argument, sorry. Go ahead. You're here for the MCO. Yes. May it please the court, my name is Stephen Whitmer, and I'll be presenting the arguments on behalf of the MCO intervener defendants. My role here is limited today, and I'm only gonna be talking about how arbitration is impacted by this dispute. Mr. Whitmer, do the MCOs agree that St. Anthony's can bring what is basically a pattern and practice claim under the arbitration provision? That is, it can bring a broad claim that the MCO isn't meeting its obligation to pay in 30 days and then refer to however many hundreds, thousands of claims to make that case in arbitration? Absolutely, and that was the question you had asked earlier. We agree with you 100%. If you look at the contract, there's no limitation on the scope of what St. Anthony can allege, and I think counsel for St. Anthony agreed. And I think that really is a central point here. Anything and everything in dispute between St. Anthony and any given MCO can be resolved in one single arbitration. I think the vacated decision suggested you might need 1,000 arbitrations, but you don't. You need one arbitration between one MCO and St. Anthony. And in that arbitration, St. Anthony can address which claims are owed, which claims are paid late, anything else they wanna bring if they wanna talk about some sort of systemic, broader issue. All of that would be brought before an arbitrator. And I think it's important to note this is what arbitrators do. And in fact, they have special expertise in dealing with these types of disputes. They deal with them every day. And that's against the backdrop we've been talking about, which is St. Anthony agreed to arbitrate this through mandatory arbitration provisions with three of the MCOs that are before this court. So St. Anthony agreed to it, and I would say it's pretty clear that arbitration works. In fact, you haven't heard anything in the record that would suggest that arbitration doesn't work here. So against that backdrop, option one- There aren't any time limits. The case has been going on for a while. If St. Anthony's wanted to pursue arbitration tomorrow, there aren't any time constraints, are there? Well, obviously, they're gonna have statute of limitations at some point, but with respect to this dispute, St. Anthony could be bringing a claim against any of the MCOs. And I think you asked the question earlier about what's the status of that one arbitration. The arbitrators in that case, the arbitrator asked, he said, go ahead and try to resolve your disputes up front. The MCO reached out to St. Anthony and said, okay, what are the disputes? Let's try to address them. St. Anthony said, we don't have any disputes with you, MCO. At the very same time, St. Anthony was telling the federal court that it had a host of disputes. And so as a result of that, we went in circles and then the arbitration didn't proceed, but as counsel correctly said, it stayed. But I do think that leads us to, I think, an important question, which is, if not arbitration, what's the alternative? And we would submit to you that the alternative does not make any sense at all. And that would be providing a host of thousands or tens of thousands of Medicaid disputes to district courts in Illinois, Wisconsin, and Indiana. That, respectfully, would not make sense. Wouldn't the systemic requirement prevent a host of individual suits being brought? Well, the problem is, as we talked about earlier, where do you draw the line? What is systemic and what isn't? Either way, wherever you draw that line, the underlying factual predicate has to get resolved somewhere. You wouldn't know if you had a systemic problem until you looked at each of the individual thousands or more claims to find out, is there a problem? Are the claims being paid on time? Are they not? Is a charge being coded correctly? Is it being billed correctly? Is it the kind of thing that there's a lot of them, a literal, all those things, respectfully, those are not the business of federal courts. In contrast, those are the business of arbitrators who handle this very type of dispute day in and day out and resolve them. So against this backdrop, I think we conclude with a key point. The arbitration system works, it's been working, and there's nothing suggesting that it doesn't. And if you juxtapose that against placing an incredible burden on federal courts throughout this circuit, there's no reason to do that, and this is not the kind of thing that federal courts ought to be doing. If there are no further questions, I think I've used my time. Okay, thank you. The contract between the MCOs and the state is 327 pages. They're very lengthy. There's even a sample contract on the website. There is a provision in the contract for sanctions against imposing civil money penalties, late fees, performance penalties, et cetera, and other sanctions on a contractor for a contractor's failure to substantially comply. Part of the entire contract that we're talking about, and that goes to the incentives, right? Yeah, and I think that's a key point, right, which is to suggest that possibility that the MCOs don't really care and that they're being flippant. There is incredible scrutiny by the state over the MCO system. Just as you pointed out, there's all sorts of powers that the state has. The state has the power to evaluate, for example, what you just said. If there's any problem, it could be sanctions. It could be all sorts of things. And there's also a practical thing, right, which is the MCOs wanna do the right thing because they wanna continue to expand their business and do what they do in the state, right? So you're right, Judge. That is absolutely an important incentive and one that the MCOs don't take lightly. Thank you. Thank you. All right, Mr. Feldman, Roberto, I'll give you a little extra time. Thank you. I'll try to make, if my counting is right, three points fairly quickly. First, just correcting something that Mr. Hazzard stated at the beginning in response, I think it was Judge Brennan's question about what was pleaded in terms of the timeline, how long it was taking to pay claims. And Mr. Hazzard stated, well, the complaint says the data came from a state website on the timeliness. And that's partly true. It did come from a state website, but the point, and it's in the briefs, is at that point, the state was not measuring the statutory timeline. At that point, what the state was measuring was the time from submission of a claim to the adjudication of a claim. The adjudication is when the MCO says, yes, we're going to pay it. But the statute says, all right, you've adjudicated the claim, you're gonna pay it, but when do you make the payment? They were not tracking that information. So the data on that timeline, was slower than what was actually happened, it was faster than what was actually happening in the real world. The MCOs were taking longer time to pay those claims than what even that data showed at the time, because they were not tracking the statutory bogey of time to payment. So I wanted to correct the record on that. Second, much of Mr. Hazzard's argument is this distinction between supposedly statutory obligations and contractual obligations. Their argument in essence is, their only obligation, their only obligation is to put the prompt payment requirement in a contract with the MCOs. And after that, they have no obligation whatsoever, they have unfettered discretion, they can completely walk away from the problem. And they even characterize it as their right, as if Congress in enacting Section U2F was saying, we're taking Section 37A, we're taking a right from providers that the state owes to providers already, we're gonna let the state put it in a contract with MCOs and the state can then walk away from the problem entirely. That was not and could not have been Congress's intent in allowing the state to move the claim processing over to a private entity, it was not allowing the state to wash its hands of the process. And that gets to the enforcement type of questions that Judge Hamilton was asking. And I think the enforcement questions are part of the answer to the earlier questions about systemic, which is based not only on the Section 37A, that there'd be claim payment procedures, which is a systemic looking language, but the enforcement language that Judge Hamilton flagged. And then finally, with regard to the MCO argument, they've created this boogeyman about the federal courts being flooded with thousands and thousands of individual adjudication, if the court were to recognize a right of action here. Well, first of all, the right of action was recognized by three district courts that we cited in the briefing going back to 2013. The panel opinion was issued initially in 2012, there's been 2022, there's been no flood. And it makes sense that there'd be no flood of lawsuits because what provider is gonna come to pay lawyers to come to federal court to bring a claim against the hand that feeds them, the state, unless there was a very serious problem going on. And the claim here does not require adjudication, a review of all the minute adjudications and whether someone was covered or not. Remember, the claim is whether a clean claim is paid on a specific timeline. Clean claim is defined as all the paperwork that needed to be submitted was submitted and it was adequate for the MCOs to decide the claim. So you don't have to look at all the minutia about was this MRI covered or not? They've already determined that it is, you're just looking at a clock and you're looking at data for how long it took for them to pay the claim. That does not require, that does not enmesh the federal courts in thousands and thousands of individual claims. Unless there are further questions, I think the court, it's time and ask that the district court be reversed. Thank you very much. And thank you to all counsel will take the case under advisement. And that concludes our calendar for today. The court is in recess.